## STATEMENT OF THE CASE

Pursuant to 38 U.S.C. §7462 and Rule 15 of the Federal Rules of Appellate Procedure, on June 21, 2016, the petitioner Russell Martin, a title 38 employee at the Beckley, West Virginia Veterans Administration Medical Center (hereinafter "VAMC") filed his Petition for Review of the decision of the Principal Undersecretary for Health approving the action of the VA disciplinary appeals board, (hereinafter "DAB"), which was received by him on May 21, 2016.  This is a major adverse action and the charges involve issues of professional conduct and competence as defined by 38 U.S.C. §7462.  As such, the appeal is properly before the Court.

## STATEMENT OF THE FACTS

Rusty Martin is a highly decorate veteran who received his physician assistant training and experience before retiring as a Lieutenant Colonel. Rec. at 446, p. 28. He continued his service to his country through employment with the VA. Martin served in the union to protect his fellow employees. Rec. at 737, pp. 471-72.[1]  Martin took over the Occupational Health Department ("OC") in December 2013. Rec. at 440, p. 4.  Martin took his OC and union positions seriously and enjoyed assuring a safe working environment for the VAMC employees.  Rec. at 737, p. 472-73.

The OC was in disarray when Martin started there and great effort was placed in correcting it.[2]  He cleaned, organized and reinstituted required policies and procedures. Rec. at 441, p. 5; 788 at p. 675.  His efforts were rewarded via excellent annual performance reviews.  Rec. at 296-300. Due to his expansion to meet VA guidelines,[3] Martin twice sought help, [Rec. at 221-27], but was twice refused. Rec. at 497, p.8. He sought help from the summer volunteer pool, unassigned primary care nurses and light duty personnel.[4]

---

[1] Rec. at 741, p. 489; *Id.* at 742, p. 490; *Id.* at 795, p. 704; *Id.* at 797, p. 710; 737, pp. 472-73.
[2] Rec. at 441, p. 5; Rec. at 292-300.
[3] Rec. at 292-300.
[4] Rec. at 752-53 (AIB pp. 533-34). Ward, Martin's supervisor, admitted her knowledge of his requests for help. Rec. at 498, p. 9.

In June 2014, Martin's union duties had him investigating improper conduct by the Chief Pharmacist Rappold. Rec. at 1096-99. Due to Martin's dogged investigation, Office of Special Counsel, ("OSC"), conducted an on-site investigation at the pharmacy into Rappold's illegal practices and eventually determined Rappold was substituting veterans drugs for older, cheaper drugs to get larger bonuses.[5]  Rec. at 1068-94.

Because Martin revealed Rappold's deplorable conduct, she wanted revenge and she took it quick. Rec. at 478, pp. 25-26. Thus, within three days of OSC's onsite inquiry into the pharmacy, Rappold reported that a new employee, Blankenship was now suddenly claiming to have been sexually assaulted by Martin during the pre-employment physical given two months prior.[6]  Rappold admitted to spearheading the investigation of Martin by filing a point of contact and insisting that Blankenship file a report also.[7] Rappold freely exclaimed her disdain for Martin and proudly acknowledging that her opinion was shared by her pharmacy employees even prior to the Blankenship incident..[8]  Conversely, an unbiased pharmacist, Moorman, discussed the on-going nature of these demeaning comments, but remained adamant that

---

[5] The OSC recommended administrative action be taken.  However, Rappold was permitted by Beckley VAMC Director, McGraw, to retire without any repercussions.  Conversely, the OIG recommended no action against Martin, but McGraw took administrative action against Martin thereby going against her very justification for NOT punishing Rappold.  *See* Rec. at 803, p. 736. *Compare* Rec. at 797, p. 711 *with* 803, p. 735-36.

[6] Rec. at 290; 202-05.  The OSC on premises investigation was conducted in 2015 between Tuesday, September 9th and Friday, September 12th.  Agency action against Martin began the following Wednesday, September 17th when Rappold contacted the Chief of Staff by email claiming she had something to tell him.  Record at 290.

[7] Rec. at 396, p. 20; 474, p. 6-8. Accordingly, less than a week after the OSC left the Beckley pharmacy, on September 18, 2014, Blankenship, at Rappold's insistence, (Rec. at 396, p. 20), filed a police report claiming that Martin sexually assaulted her. Rec. at 202-05. Blankenship, who is medically designated obese, (Rec. at 897), claimed that Martin could fit his whole hand into her jeans and underwear far enough, and with room enough, to then cup his fingers and run them over her private parts. Rec. at 207-08.

[8] Rec. at 477, p. 19 ("that's the way every female wo works in the pharmacy feels").  *See also,* Rec. at 478, p. 23 (it's a close group).  This closeness is also evident from the fact that no one in her close group reported her illegal conduct to the authorities despite its continuing nature.  *See* Rec. at 1068-1094.  Rec. at 476-78 (AIB transcript pp. 15, 19, 23-24).

Martin's character assassination was without basis in fact by those spreading it. Rec. at 464, pp. 9-10. Moorman testified that she was not uncomfortable and nothing inappropriate happened in her exam. Rec. at 463, pp. 6-7. It was not until after she began her employment that Moorman began hearing derogatory comments about Martin in the pharmacy. Rec. at 465, p. 14. In fact, in response to Osman's attempt to lead Moorman into saying that Martin is creepy or a pervert, Moorman exclaimed that she never experienced anything like that nor had the people who were saying it. Rec. at 464, pp. at 9-10. Rappold's testimony establishes that she created the negative perception, but she was unable to prove it without revealing her illicit conduct and Martin's investigation of it. Rec. at 476-78. Oblivious to how she should feel when confronted by the veteran who caught her stealing from sick veterans for personal gain, Rappold revealed herself by testifying that "interaction with him" made her feel "sleazy," stating that she was "just being honest" because "that's the way [she] feel[s]."[9] Not only was Rappold permitted to destroy Martin's character within the pharmacy, and not only was she was permitted to testify at the AIB in such a way as to set the tone for the AIB to match the predator personification she successfully created in the pharmacy,[10] she was permitted to personally escort Blankenship through the steps of the investigation without Agency consideration of the undue pressure placed on a new employee to please her new boss. Rec. at 474, p. 8. In fact, the Agency permitted Rappold's control over Blankenship's statements to local agency police, the OIG and the AIB even though it was known to Director McGraw and Perkins, the AIB Chairman, that Martin revealed Rappold's unlawful practices.[11]

The OIG initiated an inquiry and Martin was placed on leave within a couple of days of the on-site OSC pharmacy investigation. Rec. at 205, 522, 750. The OIG finished its' investigation and found no

---

[9] Rec. at 477, p. 19. *See also,* Rec. at 476, p. 15; 478, p.23-24. Moorman provides reason for Rappold's disdain of Martin wherein she testified that Martin was in the pharmacy area frequently looking for Rappold on union business. Rec. at 465, p. 13.
[10] Rec. at 473-79; Rec. at 33-44.
[11] Rec. at 667, p. 307. Rappold retired and McGraw was punished for the illegal conduct.

intentional conduct and no probable cause, recommending no action be taken against Martin. Rec. at 796, p. 706. Contrary thereto, McGraw initiated an AIB which convened on March 15, 2015. Rec. at 797. At the AIB, Blankenship's testimony became more egregious than in her initial reports to the VAMC police. *Compare* Rec. at 207-08 *with* Rec. at 393, p. 7. This time Blankenship claimed that Martin conducted a femoral artery pulse exam, (hereinafter "FAP" exam), and was somehow able to look down under or through his hand and arm into her blue jeans at her "private parts." Rec. at 393. *See also*, fnt. 7. The escalation of Blankenship's testimony was explained by Rappold wherein she described how disappointed she and Blankenship were when the OIG found no probable cause to bring charges against Martin.  Rec. at 479. The Agency also relied on testimony of Hayhurst and Athey. Hayhurst admitted previously discussing her OIG testimony with Athey.[12] Although Hayhurst had told the OIG that Martin did nothing to make her uncomfortable, she reported being quite uncomfortable to the AIB.[13] The AIB did not question Hayhurst about changing her testimony from comfortable to uncomfortable, but helped inflame her account.[14] In response to Osman's leading question, "So he stood there and watched you pull your shirt up," Hayhurst answered yes.  Rec. at 427, p. 17. She did admit that there was no inappropriate touching,[15] and that her bra remained on throughout.  Rec. at 424, p. 5.

    Athey was called as a witness by the AIB after Hayhurst improperly discussed the matter with her. Rec. at 425, p. 12-13. Athey, a certified nursing assistant, ("CNA"), whose job it is to provide unchaperoned

---

[12]  Rec. at 426, p. 13 L21-24. Handbook 0700 requires Perkins, the AIB chair, to report this admission because it is a violation of policy to discuss investigations. Addendum at 4-1 and 4-2. Nevertheless, instead of reporting it, they used it to call Athey to testify. This violation was both ignored and omitted in their final report. Rec. at 32-40.  Further, the AIB failed to illicit the personal bias that existed between Athey and the Martin family as a result of Athey's dislike of Martin's spouse, (Athey's CNA instructor), which the AIB chair admitted was in violation of 0700.  *See generally*, Rec. at 386-89.  *See also*, Rec. at 704. AFGE agreement also prohibits employees from disclosing information about investigations.  Rec. at 1243.

[13] *Compare* Rec. at 522 *with* 427, p. 17.

[14] Rec. at 427, p. 17. *See also*, Rec. at 426, p. 13; Rec. at 388, p. 14.

[15]Rec. at 424, p. 7

duties such as bathing patients, testified that Martin conducted what she believed in her mind to be a FAP exam on her without explaining what he was doing. Rec. at 386, p. 7-8.[16] But her self-diagnosis was contradicted by her description of the exam. She described an exam at the top of her pants. Rec. at 386, p. 8. By comparison, Martin described the actual correct anatomical region as being in the groin region, and a nurse practitioner witness confirmed it. Rec. at 403, 447. Athey repeated this explanation to the DAB and even pointed to an area in the front abdominal region at the top of her pants. Rec. at 609, p. 74.

The Agency reviewed the examination records of employees questioned but did not permit Martin to see them.[17] The AIB then questioned Martin knowing that he had not been provided examination records for review.  Rec. at 448, p. 33; 717, p. 393.  Martin's testimony to the AIB was consistent to that given to the OIG.  *Compare* Rec. at 440-51 *with* Rec. at 524-27.  Without knowing who had made complaints against him or what the complaints were about and because OC exams differ based upon the job duties of the applicant, [Rec. at 73; Rec. at 313] Martin could answer only some things unequivocally as he had conducted hundreds of exams in the past year.  Rec at 445, p. 21; Rec. at 798-99. Martin could only guess what he might do and why in every scenario he could imagine, including mandatory training and practice on volunteers. Rec. at 708, p. 355.  *See also*, 617, p. 106-07. Even Osman, the AIB Occupational Health PA, admitted that he would not be able to recall examinations he had given a year previous without his exam records. Rec. at 640, pp. 198-99.  Martin testified consistently that he never asked a patient to remove clothing for any exam. Rec. at 443, p. 15; 744, p. 499. The record reveals Martin has even told patients not to undress, [Rec. at 443, p. 15;  757 p. 550], including presumably Blankenship who told the OIG that while

_____

[16] During time between the OIG and the AIB investigations, rumors concerning FAP exams by Martin abounded. Rec. at 396, p. 17; 403, p. 11; 438, p. 13; 448, p.33; 459, p. 9; 463, p. 8; 465, p. 14; 476, p. 14; 498, pp. 11-12; 625, p. 137; 629, p. 154; 728, p. 434; 799, p. 721. Employees were aware of the timing of the OSC and OIG investigations, and were openly discussing the allegations made against Martin. *Id*. Hayhurst and Athey even admitted it. *Id*.
[17] Rec. at 388, p. 13; 397, p. 21-22; 406, p. 13; 412, p. 9; 425, p. 9-10; 458, p. 6; 465, 15; 500, p. 18-19.

Martin left the room to get the EKG machine, she sat up to remove her bra. Rec. at 507. Martin must have stopped her as her shirt and bra remained on throughout the exam. *Id. See also*, Rec. at 393, p. 8. Clothes remaining on was confirmed by every AIB witness asked.[18] Martin further explained that because an EKG is part of the exam, when necessary, he would ask the patient to unfasten their bra, leaving it in place over the breasts to keep the patient from being exposed. Rec. at 441, p. 15.  On occasion, large bodied patients would need to unfasten the top of their pants in order for him to perform an abdominal exam.  Rec. at 449, p. 38. Martin consistently testified that he offered chaperones and if one was wanted, he would get a nurse, and she would perform the EKG.  Rec. at 444, p. 18; Rec. at 761, p. 566.   At no time did anyone testify that Rusty refused to provide a chaperone.[19]   Robes were not provided because clothes were not removed, [Rec. at 757] and Martin's supervisor, Ward agreed they are unnecessary.  Rec. at 776, p. 626.  Martin provided the AIB with guidelines on EKG procedures, recommendations on FAP exams, current OC health policies, and suggested questioning the onsite vascular specialist.  Rec. at 229-288; 302-325; Rec. at 448, p. 34; Rec. at 982. The AIB neither consulted the medical treatises nor spoke with the specialist, instead, based findings on personal opinions. Rec. at 616-17; 642-43, p. 209-10; 663.

The AIB final report was released on April 17, 2015. Rec. at 33-44. The AIB found "<u>no evidence to support intentional touching of a sexual nature</u>," but determined there was evidence substantiating unprofessional conduct and inappropriate professional practice,[20] based primarily on the testimonies of Rappold, Blankenship, Hayhurst and Athey to the exclusion of everyone else. Rec. at 33-44. All witnesses giving positive testimony about Martin were disregarded by the AIB.[21]

---

[18] Rec. at 386, p. 7; 394, p. 11; 417, p. 7; 458, p. 7; 464, p. 12; 513; 519; 521.
[19] *See generally*, record. Similarly, no one testified that Rusty Martin is a liar. Rec. at 804, p. 739.
[20] (hereinafter "UC and IPP").
[21] *Compare* Rec. at 33-44 *with* Rec. at 535, 532, 529, 518, 514-15, 513, 510, 500, p. 18; 463, pp. 6-7; 458, pp.5-6; 459, p. 9; 432, p. 6; 424, pp. 6-7; 417, pp. 6-7; 418, pp. 10-11; 402, p. 7; 403, p. 12; 406, p. 13.

On July 17, 2015, Ward issued a proposed discharge letter to Martin where he was finally given notice of the identity his accusers and charges. Rec. at 23-28.  Martin and his union representative attempted to obtain information necessary to respond to McGraw.  His request included medical records reviewed by the AIB, the final report of the OIG and policy or regulation mandating use of chaperones. Rec. at 1036-40. The Agency repeatedly refused to provide any requested information thereby forcing the union to file a formal grievance and subsequent ULP action. *Id.*  Through a settlement agreement made AFTER Martin's termination, Martin was finally provided some portions of the requested documentation,[22] but was denied use of the information by the DAB in a pre-hearing conference.  Rec. at 1009-14.

Despite the Agency's refusal to provide the documents, on September 1, 2015, Martin was forced by McGraw to defend himself.  Rec. at 17-21.[23]  Without his examination notes, Martin could not directly respond to accusations that were contained in the proposed discharge letter as established fact.[24] So, during the meeting with McGraw, and consistent with his AIB testimony, Martin explained that he would have only conducted a FAP exam on a patient if they had presented with indicators that the exam was necessary. Rec. at 17-21. He generally explained when such exam is necessary, but without the exam records, he could not respond to the accusation that he had actually conducted a FAP exam on anyone.  *Id.*  He did explain, however, that given the patient descriptions of the exam, it could not have been FAP exams, because if it had been done, it would have been done properly by him: checking both sides with a stethoscope in the groin area. *Id.*  Neither Blankenship nor Athey gave this description.[25] Rusty attempted to explain that the testimony does not support the charges because it is contradictory, inaccurate and unsupported by law, regulation or policy. *Id.* The more Martin attempted to explain and defend himself, the more McGraw took

---

[22] Rec. at 1042-61
[23] Rec. at 1042-61; Rec. at 1020-22; Rec. at 878-959; 1010.
[24] Rec. at 17-21.
[25] Blankenship testified that only one side was checked [Rec. at 394, p.11], and Athey said it was performed on her belly. Rec. at 386, pp. 7-8.

his defense as lack of remorse.  Rec. at 17-21, 798.  McGraw meeting notes reflect that her determination to terminate Martin was influenced by upset at Martin's attempt to defend himself.  *Id.* The Douglas Factors reveal the same. Rec. at 30-31. In fact, McGraw testified that she had intended to fire him all along, no matter what he had to say. Rec. at 798. McGraw terminated Martin's on October 4, 2015. Rec. at 11-15.

On November 18, 2015, Martin was finally provided with "missing" pages from the AIB final report with evidence location and justification for six specifications that formed the basis of the eventual 2 charges with 11 specifications. Rec. at 652, p. 247; Rec. at 1020-22.  On December 4, 2015, Rusty was finally provided redacted copies of some of the witness' medical examination records. Rec. at 882-960.  It was only then that Martin would testify that he had not conducted a FAP exam on any of these women, including Blankenship and Athey.  Rec. at 742-43. Despite the inaccurate exam descriptions, Martin could not be absolutely sure without the records, and his integrity would not permit him to testify otherwise.

A DAB prehearing telephone conference was held.  Rec. at 1009-14. It immediately became clear that Chairman Penn had already decided in favor of the Agency, and his rulings confirmed it.  *Id.*  All agency witnesses were approved except for Rappold; all Martin's witnesses were disapproved. *Id.*  It denied Martin's motion to dismiss for due process deprivation. *Id.* Because Rusty was denied the opportunity to call witnesses to contradict Agency testimony and to bolster his credibility, Martin's only possible defense was to attempt to clarify the testimony of Agency witnesses and attack their credibility. *Id.*  However, at the hearing, Penn did not allow Martin the opportunity to do either, but instead, prohibited Martin's attempts to elicit testimony from adverse witnesses.[26] The DAB permitted Agency counsel to intimidate Martin and his

---

[26] Rec. at 602, p. 46, 48-49;604, p. 54-56; 605, p. 59; 606, p. 63-64; 622, p. 125; 626, p. 144; 628, 151-52; 632, p. 168; 633, p. 169; 636, p. 184; 637, 185-87; 638, p. 191-92; 639, p. 193-96; 640, p. 197-98; 641, p. 202-03; 642, p. 206-07; 643, p. 210; 645, p. 219; 652, 247; 654, p. 254; 656, p. 264; 658, p. 271; 659, p. 273; 660, p. 278-80; 661, p. 281, 283; 662, p. 285-88; 663, p. 290; 664, p. 293; 666, p. 303; 667, p. 306, 308; 668, p. 312; 669, p. 313-14; 670, p. 317,319-320; 671, p. 322-23; 672, p. 327; 704, p. 341; 705, p. 342; 706, p. 348-49; 709, p. 358-59, 361; 710, p. 363; 711, p. 368-69; 712, p. 373; 713, p. 375-76; 714, p. 379, 381; 715, p. 382-83; 718, p. 396-97;

counsel by allowing Agency counsel to interrupt, scream and yell at Martin's lawyer when a question was asked or an objection was made that he did not like. Rec. at 605, p. 60; 633, p. 170; 637, p. 188. On at least two occasions, the DAB threatened Martin that his attorney's conduct in questioning witnesses'[27] would be held against him in rendering a decision. Rec at 606, p. 61-62; 703, p. 334. Nearly every time Agency counsel objected, it was sustained, and usually without permitting Martin to respond. *See* footnote 26. When Martin's counsel lodged an objection for the record about having a right to respond to objections, she was told to sit down and shut up. Rec. at 661, p. 284; 751, p. 529.

The DAB did permit Martin to introduce proficiency evaluations, but refused to allow counsel to lay the foundation or establish that the evaluation was changed as a direct result of his union association to properly reflect Martin's performance giving him top scores.[28] Rec. at 800-802. In addition, the DAB refused Martin's right to question witnesses outside the scope of direct even though these witnesses were included on Martin's witness list as adverse, and even though Martin was not permitted another opportunity to call them to testify in his case-in-chief. Rec. at 603, p. 49; 605, p. 59; 730, p. 443. At the end of the hearing, the DAB failed to allow Martin to ask follow-up questions of McGraw regarding her testimony that no other employee behavior existed with which to compare to Martin's behavior and discipline [Rec. at 805, p. 742] when she clearly provided in her own testimony to Penn's questions that comparable discipline existed. Rec. at 804, p. 739-40.[29]

---

719, p. 399, 401; 724, p. 420; 725, p. 424; 730, p. 444; 732, 451,453; 734, p. 460; 737, p. 470; 741, p. 489; 742, p. 490-492; 746, p. 508-09; 753, p. 536; 754, p. 540; 759, p. 559-60; 771, p. 607,609; 772, p. 610-11; 773, p. 614, 616-17; 775, p. 623,625; 776, p. 626, 628-29; 777, p. 631; 778, p. 635, 636-37; 779, p. 639, 640-641; 780, p. 645; 781, p. 646-47; 787, p. 672; 789, p. 680; 795, p. 703-04; 796, p. 708; 797, p. 710, 713; 798, p. 715; 799, p. 718-21; 801, p. 728; 802, p. 730; 803, p. 734; 805, p. 742

[27] as permitted by the Rules of Evidence and required by the Rules of Professional Conduct's zealous representation cannons.

[28] *Compare* Rec. at 846-48 *with* 849-51; Rec. at 802.

[29] Martin's counsel was prepared to question McGraw about other Agency investigations of sexual misconduct into employees, including managers, but the Agency did not open the door.

## ARGUMENT

### I. STANDARD OF REVIEW

This Court's review of an administrative agency's action is governed by 38 U.S.C.

§ 7462(f)(2), under which:

> the court shall review the record and hold unlawful and set aside any agency action, finding, or conclusion found to be – (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) obtained without procedures required by law, rule, or regulation having been followed; or (C) unsupported by substantial evidence.

*Id.* In this instance, Rusty Martin's discharge must be set aside because the VA systematically denied him actual notice of the evidence and an opportunity to respond from the outset of the actions taken against him. This denial was achieved through Agency actions which were not in accordance with the law, which were taken in disregard of proper procedures and an abuse of discretion by Agency authorities throughout.

In determining whether an agency's decision is arbitrary and capricious, a reviewing court must consider whether the decision is based on a consideration of relevant factors and whether there has been a clear error of judgment. An agency's decision may be considered arbitrary and capricious if:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Taylor v. Principi*, 90 F. App'x 274, 276-77 (6th Cir. 2004). *See also*, *Lerner v. Shinseki*, No. 3:12-CV-565 at 11 (W.D. Ky. Oct. 10, 2013). Although this standard is a deferential one, it "does not automatically mandate adherence" to a flawed finding. *Lerner*, No. 3:12-CV-565 at 11. Otherwise stated, the standard "is not without some teeth." *Id.* "Deferential review is not no review, and deference need not be abject." *Id.* at

---

Penn did. Additionally, this evidence would have been introduced through Rusty's union representative, Miklos, if not disapproved. Rec. at 804-05; 1013. Such evidence is material not only to the penalty, it bears upon McGraw's lack of veracity. Because the agency objected to including it within the record before this Court, Martin is again foreclosed from proffering relevant, material evidence.

12.  That the Court's review is deferential "does not mean [it] must also be inconsequential," for "federal courts do not sit in review of the administrator's decisions only for the purpose of rubber stamping those decisions." *Id.*

Additionally, an agency decision must be based upon substantial evidence. Thus,

> When reviewing the factual findings of an agency, the evidence on which such findings are based must be substantial, meaning 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Olenhouse v. Commodity Credit Corp.* 42 F.3d 1560, 1581 (10th Cir. 1994).  Evidence is not substantial if it is overwhelmed by other evidence or if it constitutes mere conclusion. *Id.* (citations omitted).  The substantiality of the evidence must be based on a review of the record as a whole, and the reviewing court is not free to disregard contrary evidence in the record.

*Kreso v. Shinseki*, 67 F. Supp.3d 1235, 1237 (2014) (citations and omissions by the court).    "Under [38 U.S.C.] § 7462(f)(C), the Court also may set aside any agency action unsupported by substantial evidence." *Lerner*, No. 3:12-CV-565 at 12. Moreover, substantial evidence cannot be found where the agency has ignored or excluded relevant evidence in order to substantiate a position.  *Kreso*, 67 F. Supp. at 1239 ("a reviewing court must determine whether the agency considered <u>all</u> relevant factors….") (emphasis added). To ignore or exclude relevant evidence from admission to the record is arbitrary and capricious.  Thus,

> [a]pplying the arbitrary and capricious standard, a reviewing court must ascertain whether the agency <u>examined the relevant data</u> and articulated a rational connection between the facts found and the decision made.   In reviewing the agency's explanation, the reviewing court must determine <u>whether the agency considered all relevant factors</u> and whether there has been a clear error judgment.

*Id.* at 1239 (emphasis added).  In making this determination, the reviewing court must meticulously review the record and consider all the evidence that detracts from the Agency's decision.  Thus,

> [b]ecause 'substantiality of evidence must be based upon the record taken as a whole,' *Broadbent v. Harris*, 698 F.2d 407, 412 (10th Cir. 1983), we must 'meticulously examine the record,' *id.* at 414, to determine whether the evidence in support of the Secretary's decision is substantial and 'take into account whatever in the record fairly detracts from its weight,' *Nieto v. Heckler*, 750 F.2d 59, 61 (10th Cir. 1984).  'Failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal.' *Byron v. Heckler*, 742 F.2d 1232, 1235 (10th Cir. 1984) (quoting *Smith v. Heckler*, 707 F.2d 1284, 1285 (11th Cir. 1983)).

*Washington v. Shalala*, 37 F.3d 1437 (10th Cir. 1994) (citations by the court).

## II. THE AGENCY INTENTIONALLY WITHHELD MATERIAL, EXCULPATORY EVIDENCE IN VIOLATION OF MARTIN'S RIGHT TO DUE PROCESS.

The Agency denied Rusty Martin's Due Process right by knowingly and intentionally denying him notice of the evidence upon which he was charged and consequently denying him a meaningful opportunity to be heard. "Fundamental due process requires that notice of charges against an employee be sufficiently detailed to provide a meaningful opportunity to be heard." *Mason v. Dept. of the Navy*, 70 M.S.P.R. 584 (1996) (citing *Barresi v. U. S. Postal Service*, 65 M.S.P.R. 656, 666 (1994)). The Fourth Circuit Court of Appeals has held on numerous occasions that "suppression of evidence favorable to the accused violates the Due Process Clause when the evidence proves material either to guilt or to punishment." *Owens v. Baltimore City State's Attorney's Office*, 767 F.3d 379, 396 (2014). *See also, Barbee v. Warden, Md. Penitentiary*, 331 F.2d 842, 846-47 (4th Cir. 1964); *See e.g.*, *Strickler v. Greene*, 527 U.S. 263, 280-81 (1999). The *Barbee* Court found that the government's failure to disclose exculpatory evidence violates the accused's right to due process. *Barbee,* 331 F.2d at 846-47. In this instance, despite the Agency's refusal to provide the documents which would allow Martin the opportunity to knowingly and intelligently answer the charges against him, on September 1, 2015, Martin's due process protection was triggered when forced by McGraw to defend himself. Rec. at 17-21. He attempted to do so without: (1) the information sought by the union 7114b request and guaranteed by the AFGE[30] CBA; (2) two pages of the AIB's report, including findings B1 through B6; (3) Martin's examination notes for each patient involved, and (4) a clear understanding of what regulations/policies/procedures the agency claimed he had breached.[31] As hereinafter demonstrated, these materials were necessary to permit Martin to have actual notice of the charges against him and to meaningfully challenge them.

---

[30] The American Federation of Government Employees, (hereinafter "AFGE").
[31] Rec. at 1042-61; Rec. at 1020-22; Rec. at 878-959; 1010.

**A.  The Agency Erred by Withholding Evidence to Which Martin is Entitled for Constitutionally Adequate Notice.**

The agency's first erroneous action occurred when it denied Martin access to the supervisor's notes and subsequent Reports of Contact by Rappold and Blankenship.  Rec. at 1263.  By ignoring this requirement, the agency assured Martin was subjected to questioning without the benefit of knowing the accuser or the situation surrounding the accusations.  Rec. at 448, p. 33. This initial deprivation limited Rusty to answers to answers of a general nature that were then twisted into specific charges that led one to believe Martin gave vague, evasive and unbelievable responses to detailed questions relating to specific people and circumstances of which he could not possibly be aware because the information was inappropriately withheld from him.  *Infra* at §III. As example, the AIB report states as established fact that Martin responded, "I can't answer that," when asked why he performed a FAP exam on Ms. Blankenship. *Compare* Rec. at 445, p. 21; Rec. at 447, p. 29 *with* Rec. at 24. (charge 2, specification 1).[32] However, the AIB NEVER asked that question. *Id.* This initial deprivation, forcing generalized responses from Martin remains a key foundation of both the initial decision by McGraw and the final decision by the DAB. [33]

**B. The Agency Erred in Failing to Provide the Entire Administrative Record.**

It is axiomatic that the entire investigation record must be provided to the accused before requiring him to defend himself against the accusations.  Rec. at 1199, 1243, 1475. Agency regulations and the CBA require it as does the law. *Id. Owens,* 767 F.3d 379, at 396; *Barbee,* 331 F.2d at 846-47. Martin was not provided with pages of the AIB finding report which detailed 6 findings of fact, conclusions and supposed authority upon which those findings and conclusions were based.[34] Because those 6 findings provide a substantial basis for the DAB findings and Martin's ultimate termination, Martin had an absolute constitutional right to see that information before being forced to respond to McGraw. Because Martin was

---

[32] It states the same about Athey although never asked.  Rec. at 12 (charge 2, spec. 2).
[33] Rec. at 11-15; 855-76.
[34] Rec. at 652, pp. 246-47; Rec. at 1042-61; Rec. at 1020-22; Rec. at 878-959; 1010.

denied this information, he was obviously unable to address any of it in his response. Therefore, McGraw's reliance on these facts in discharging Martin was improper as was the DAB in upholding the discharge based on these findings.[35]

In addition to denying him the AIB findings and conclusions, Martin was denied what he needed to provide a concrete answer about whether he did or did not perform a FAP exam on any of the witnesses: the exam records. McGraw's testimony establishes that exam notes were withheld by the Agency and she was aware of it. Additionally, it made no difference to her that the Agency had failed to provide him with the evidence most critical to his defense.  Rec. at 798, p. 714, 717; 799, p. 18. She maintained her indifference despite knowing that Rusty was entitled to due process protection at the time he responded to her on the charges. *Id*. Accordingly, although McGraw admitted that she did not read the patient exam records, in response to being asked how Martin was supposed to be able to answer her as "honestly and as correctly as possible without knowing what the patients' charts said that he did in the physical," she responded, "I don't know how looking at the records would have given him any more information on which to make a statement [beyond the AIB]."  Rec. at 798, p. 714. Likewise, when asked, "[s]o in your opinion, it makes no difference whether or not he was permitted to review the physical – the records produced from the physicals in responding to you. Is that right?" McGraw responded, "yes." Rec. at 798, p. 716.  She even admitted that she knew he could not respond without the exam records; yet, it did not concern her.  *Id*. ("he did not say he didn't do it"). *Id*. Nor did McGraw care that once he was provided the exam records, Rusty was able to determine with certainty that he had not conducted a FAP exam on any of the witnesses questioned by the AIB.  Rec. at 798, pp. 716-17.  Instead, she took his denial as evidence of culpability.  Rec. at 798, p. 714 ("He tried to blame it on everybody else.").  Thus, while McGraw was admittedly aware that Martin could

---

[35] As hereinafter discussed, the DAB did not remedy this constitutionally improper deprivation, it aggravated it.  *See infra* at II E, III.

not admit or deny what he had done with certainty without the records created at the time of the exams, McGraw, in violation of Martin's due process protection, arbitrarily and capriciously and with utter indifference, terminated Martin in violation of his right to due process.

### C. The Agency Erred in Refusing to Provide Requested Section 7114 Information.

Likewise, the Agency intentionally withheld additional information from Martin that was requested by his union representative, President Miklos prior to his meeting with McGraw. Martin sought information on exams at issue and chaperone use, clearly material to Martin's defense.  Rec. at 1042-61; Rec. at 1020-22; Rec. at 878-959; 1010. The AFGE CBA provides that an employee is entitled to seek evidence he/she believes is relevant to the defense of charges made by the agency.  Rec. at 1243.  Thus, the agreement provides:

> Upon request, the subject of the investigation and the local union will be furnished a copy of the complete investigation file (not just the evidence file) and all other relevant and pertinent information which would be provided under the Freedom of Information Act (FOIA) or 5 U.S.C. 7114, which would normally include the Administrative Investigation Board (AIB) report findings.

*Id.*  The AIB authority, 0700, confirms this duty.[36] Likewise, the VA's own office of General Counsel has explained to management that the aggrieved employee is entitled to ALL information necessary for representation.  *See* Rec. at 1025-34. Because the Agency is a party to the agreement, it has knowledge of its duties set forth within. *Id.* The request was sent directly to the HR specialist who was responsible for establishing the record and drafting the Douglas Factors.  Rec. at 1036-40. Thus, the Agency was aware of the information sought and Martin's entitlement to it. Rec. at 1036-37; 1041-1045. The Agency's intentional refusal to produce the data is a direct violation of Martin's right to due process protection because

---

[36] "[c]ertain rights and protections in favor of witnesses or others established by law, regulations, policies or collective bargaining agreements nevertheless may affect the manner in which investigations must be conducted.  These include: (1) Rights established under collective bargaining agreements for bargaining unit members…." Addendum at 5-1.

the Agency's violation foreclosed Martin's ability to counter the charges of UC and IPP based upon

conducting FAP exams and lack of chaperone.  *See Taylor*, 90 F. App'x at 276-77. All but 1 of the 11 DAB

upheld specifications are based upon the exams,[37] and 6 of those are supported by the lack of a chaperone.[38]

3 others are based completely thereupon.[39]  Rec. at 856-76. But for this deprivation, Martin could have

unequivocally established that the VAMC DOES NOT require or use chaperones in rendering health care

so failing to use them violates nothing. Rec. at 1042-61. Likewise, had Martin been provided the exam

records, he could have affirmatively denied doing the FAP exam from the start and avoided being forced to

testify to and with the generalities upon which the Agency has improperly based its decision. Because of the

Agency's intentional denial of Martin's due process protection, 10 of the 11[40] Agency specifications to

which the evidence was material, even exculpatory, should be overturned. *Id*. at 542-46. *See also, Barbee*,

341 F.2d at 846-47.

### D. <u>The Agency Erred in Failing to Undertake Agency Procedures Existing to Avoid Agency Due Process Violations.</u>

The Agency could have resolved its due process violations up to this point, but chose not to do so.

While an agency's interpretation of its own regulations is entitled to deference, such interpretations are

subject to rejection when the interpretation is "unreasonable, plainly erroneous or inconsistent with the

regulation's plain meaning." Kreso, 67 F. Supp. at 1235-36. Furthermore, such interpretation, or in this case,

total disregard, cannot usurp a title 38 employee's right to his constitutionally protected right to procedural

due process.  *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541, 105 S. Ct. 1487 (1985). The

Supreme Court has instructed that where an agency's interpretation of procedures denies an employee

---

[37] All except charge 2, specification 5.

[38] All of charge 1 and all of charge 2, except spec. 5 and charge 4, spec. 2.

[39] Charge 2, specifications 6-8.

[40] Every charge and specification to which Martin was improper denied evidence should be set aside. *Mason v. Dept. of the Navy*, 70 M.S.P.R. 584 (1996), *Barresi v. U. S. Postal Service*, 65 M.S.P.R. 656, 666 (1994).

notice of the employer's evidence and an opportunity to respond to that evidence, the agency's decision must be set aside. *Id.* at 542-46. *See also*, *Stone v. F.D.I.C.*, No. 98-3012 (Fed. Cir. June 11, 1999) ("[w]here a serious procedural curtailment mars an adverse personnel action which deprives the employee of pay, the court has regularly taken the position that the defect divests the removal (or demotion) of legality …."). While the Agency has mandatory procedures in place to correct due process problems, it inexplicably failed to undertake them. The procedure requires the completed AIB package be reviewed by both HR and the deciding official. Addendum at 6-5. These reviews permit the Agency to correct investigatory deficiencies. The agency is required also to discuss any proposed disciplinary concerns prior to reducing any charges to writing. Addendum at 44. This was not done. HR is required to perform a quality check on the AIB file to assure completeness and correctness and that the record has been made without breaching any existing policy, rule, law, regulation or CBA. Rec. at 1473. It did not. Likewise, McGraw failed to review and certify the that AIB report complies with VA Directive 0700 and the AFGE Agreement. Record at 1136-1463; addendum at 6-5. The Agency's disregard of its own procedures not only allowed the continued denial of Martin's due process, the Agency jeopardized its own action against him by leaving the due process problems unaddressed.

## E. The DAB Refused to Correct the Agency Due Process Violations, Compounding Them Instead.

The due process deprivation below was not remedied by the DAB either. Instead, its rulings from the prehearing conference on served only to compound the already glaring due process violations. Thus, at the prehearing conference, it denied Martin's motion to set aside the termination for lack of due process, reasoning that the DAB hearing was Martin's opportunity for due process. Rec. at 1009-14. However, that opportunity evaporated immediately when Penn also denied all of Martin's witnesses and the evidence to be introduced through them. *Id.* Martin's inability to call Miklos as a witness was especially harmful given her involvement, the breadth of information she could have provided, the expanse of foundation she could have

laid and the documentary evidence that would have come into evidence through her as AFGE President. Rec. at 963-70; 1009-14; 1036-43.

Additionally, the DAB's ruling excluding the section 7114b evidence as irrelevant likewise contradicted its acknowledgment of Martin's due process protection. Rec. at 721, pp. 408-09; 722, p. 410. Rec. at 1009-14; 855-876.[41]  This arbitrary and capricious refusal is evident from its decision upholding 9 of 11 specifications based either directly or indirectly on the lack of chaperone use.  Rec. at 855-876.[42] However the DAB refused to even entertain Martin's argument that barring all his witnesses and now his evidence would eliminate the very same DAB due process opportunity that Penn had just used as a basis for refusing to grant Martin's motion. Rec. at 1009-14. The DAB's ruling that the information is irrelevant to the DAB hearing was therefore, not only capricious, but constitutes another Agency deprivation.[43]

Although the DAB did require the Agency to produce a portion of the exam records which finally allowed Martin to determine that he had not performed a FAP exam on Blankenship or Athey, the damage resulting from the lack of timely production prior to his response to McGraw was already done. Although no one claimed Martin was an untruthful person, the Agency refused to believe Martin's testimony that he was positive that he did not conduct FAPs on the witnesses because he was unable without the exam records to affirmatively do so. Rec. at 856-76.  The DAB failed to consider Rusty's prior testimony

---

[41] Some of the 7114b request was produced, but only after Martin filed an unfair labor practice complaint with the National Labor Relations Board.  Rec. at 1042-61.

[42] This includes all specs, but two: charge 2, spec. 5 (skimping), and charge 4, spec. 2 (inaccurate documentation).

[43]The lack of a chaperone policy is not a secret at the VA.  Everyone involved in the inquiry, the discharge and the DAB appeal KNEW that chaperone use is not required. Rec. at 627, p.146; 712, p. 370; 19; 867-869. Yet none of these individuals had the moral decency to acknowledge they were charging an innocent man with an offense that he did not commit because it does not exist.  If that is not arbitrary and capricious, nothing is. This ruling also constitutes a violation of the national CBA amounting to nothing short of an abuse of discretion resulting in the DAB's failure to consider an important aspect of the chaperone problem.  *See* 38 U.S.C. §7462(f)(2), *Taylor*, 90 F. App'x at 276-77, *Kreso*, 67 F. Supp.3d at 1239.

establishing his integrity wherein he would neither admit nor deny that the exams had occurred without an independent recollection or the records he made at the time of the exam no matter how badly it hurt his position. The DAB found Martin to be untruthful without considering its denial of witnesses who would have testified to reputation for truth and veracity in the workplace.  Rec. at 1009-14.

   In addition to prehearing rulings operating to further the Agency's prior deprivations, the DAB's evidentiary rulings operated to further limit Martin's defense. The DAB prejudicial  rulings in favor of the Agency and against Martin foreclosed the only avenue left to put on any semblance of a defense. Martin ws forbidden to question witnesses on credibility. Thus, the DAB refused to allow any questions to Blankenship about her knowledge of the pharmacy scandal.  Rec. at 603, p. 49.  The DAB refused to allow questions and introduction of evidence concerning Blankenship's arm injury and her ability to unhook clothing without assistance.  Rec. at 606, p. 64. Similarly, despite Blankenship's testimony that only her husband should touch her, the DAB refused counsel's attempts to question her about her affair that ultimately resulted in her divorce from her first husband.  Rec. at 604, pp. 53-55. Indeed, even when attempting to clarify where Blankenship claims to have been inappropriately touched, the DAB reprimanded Martin's counsel and threatened to take action against her and Martin with the Undersecretary of Health in D.C.  Rec. at 606, p. 61-62.[44]

   Although the Agency's conduct in this case is sufficient for the court to hold unlawful and set aside the Agency's findings and conclusions, it pales in comparison to the abuse of discretion displayed by the DAB Chairman, Penn and his technical advisor, Helle. These two members of the DAB are charged with knowing how to conduct a DAB, including the inapplicability of the rules of evidence.  Addendum at 1-1, 1-2. They even admitted their knowledge that the DAB is part of Martin's right to due process protection.

---

[44] Blankenship's "private parts" was never identified on the record and the DAB, arbitrarily and capriciously forbid Martin to ask this extremely relevant question. Rec. at 668, p. 312; 669, pp. 313-14.

Rec. at 742, p. 410; 1009-1014. Nevertheless, besides refusing Rusty's independent witnesses and evidence, at the hearing, the DAB limited Martin's questioning to cross-examination within the scope of the Agencies direct. Rec. at 603, 605, 730. He was further denied the opportunity to recall them to put on his evidence. Rec. at 662, p. 288. Allowing the Agency to bring in only that which supported its case and refusing Martin the same opportunity is a clear abuse of discretion. Rec. at 603, 605, 730. The DAB abuse of discretion goes from evident to outrageous, however, when it threatened counsel for questioning the veracity and motive of the witnesses. Rec. at 606, p. 61-62. In fact, it was enough that Martin's counsel was threatened for doing her job at the outset of the first day of the hearing; but Chairman Penn then opened the second day's hearing by putting on the record that if Martin did not control his attorney, the DAB would hold it against him in its decision. Rec. at 703, p. 334. These threats intimidated not only Martin but his counsel, and limited her defense of Martin for fear of improper retribution by the DAB. *Id.* at 703. This is evident from the record wherein counsel states she will not question witnesses with anything which might upset them, and she threw out pages of examination questions for fear of the DAB's retribution to her client.  Given this matter began from Rappold's desire for retribution, additional DAB threats of retribution against her client was shocking, improper and unprofessional. Rec. at 636, p. 184. *See also*, Rec. at 803, p. 734.

In addition to the threats and intimidation by Penn and Helle, the DAB abused its discretion in refusing to allow counsel to respond to Agency objections. Nearly all questions asked by Martin's counsel were met with objection. Nearly all of them were sustained on behalf of the Agency without allowing Martin's counsel to respond. *See* footnote 26. The DAB not only abused its discretion in refusing to allow Martin a response to the objections, when counsel espoused her right to do so, she was told that she was not permitted to respond unless Penn told her she could. Rec. at 704-05. She was instructed to be quiet and sit down. Rec. at 661, p.284; 751, p. 529.  Thus, the DAB's conduct exceeded arbitrary and capricious: it was an outrageous abuse of discretion substantially impacting counsel's ability to put on Martin's defense.

Finally, the DAB's capricious and abusive conduct can be seen in other rulings and comments made throughout the course of the hearing.  For example, Chairman Penn allowed one of the Agency attorneys, Steven Butera to yell at Martin's counsel. Rec. at 605, p.60; 633, p. 170; 637, p.188. Although after complaint Butera was admonished to control himself, he was permitted to continue with this disruptive behavior the next day without acknowledgement by the DAB except to the extent that it forced Martin's counsel to apologize to Butera for telling him to quit screaming at her.  *Id.* at 637, p. 188.

Because the Agency knowingly and intentionally withheld the evidence to which Martin was entitled, continually refusing to provide it despite law, regulation, policy and CBA requirement to do so, and such information was material, even dispositive of the vast majority of the charges, Rusty Martin was denied his constitutional right to adequate notice and a meaningful defense. Although the Agency's own procedures and policies, if undertaken, would have permitted the Agency to correct its deprivation, the Agency in utter disregard of Martin's rights and its action against him, did not do so. Likewise, while the DAB had the opportunity to amend the constitutional deficiencies, it refused to do so choosing instead to compound the deprivation through disallowing Martin an opportunity to present evidence and witnesses in his defense, refusing to allow questioning of witness bias, motive or veracity, refusing to allow interrogation exceeding the scope of the Agencies direct and prohibiting Martin from putting forth a case-in-chief at the close of the Agency's case. Because of these arbitrary and capricious Agency actions amounting to an abuse of discretion in denial of Martin's rights, the Agency determination should be set aside for denying Rusty Martin due process of law.

## III.  THE AGENCY DECISION WAS ARBITRARILY MADE WITHOUT SUBSTANTIAL EVIDENTIARY SUPPORT IN DISREGARD OF LAW AND PROPER PROCEUDRE.

### A.  Agency Findings and Conclusions Were Obtained in Violation of Instruction Given to Abide by the Proper Procedure, VA Handbook 0700.

In addition to the foregoing due process deprivations, the Agency violated its own regulations to

reach the findings and conclusions ultimately supporting Martin's discharge. Thus, the AIB was instructed to investigate Martin in accordance with Handbook 0700. Rec. at 46-47. The 0700 instructs that "the more important the testimony is to the issues of the investigation, the more important it is that the testimony be complete and reliably documented." VA HANDBOOK 0700, Witness Interviews 1 *Forms of Testimony and Documentation Requirements*. Likewise, 0700 defines issues and material evidence which must be thoroughly investigated as, "Issue: [t]he questions, within the scope of the investigation, that the AIB is responsible for answering. Issues generally include the "who, what, where, when, and why" of the incident prompting the investigation." VA HANDBOOK 0700, Definitions, *Issues*. "Material Evidence" is defined as

> 'Evidence' is any information considered by a factfinder that makes a particular matter or asserted fact more, or less, likely to be true ("factfinders" include both the AIB members and those who use investigative reports for decision-making). Evidence is "material" to an investigation if the matter it tends to prove or disprove is logically connected to an issue of the investigation and it does not unnecessarily duplicate other evidence tending to prove or disprove the same matter.

*Id*. at A-1 *Material Evidence*.

Although the basis for 9 of 11 specifications underlying the DAB decision, the Agency failed to seek information about the chaperone issue beyond asking Martin's supervisor, Ward, a bias witness, whether chaperones could have been available had Martin requested one. Rec. at 625, pp. 138-39; 713, p. 376; 714, p. 379; 715, p. 384; 717, p. 390. Ward is the proposing official in this case. A witness proposing an employee's discharge is clearly bias in favor of that employee's discharge. *Lerner v. Shinseki* (No. 3:12-CV-565 Oct. 10, 2013) at 20, 29, 40 (reliance on bias testimony is improper). The 0700 addresses witness bias and instructs that such bias must be considered in making a determination. Thus, 0700 provides:

> *Bias.* Certain interests or attitudes on the part of a witness may cause a witness, consciously or unconsciously, to shade his or her recollections or testimony. The nature and intensity of the witness's interest is a critical factor in assessing bias. The fact that a witness's testimony may be self-serving is not sufficient grounds for disbelieving that testimony, but it is a factor for consideration in assessing the probative weight of the evidence.

VA HANDBOOK 0700, <u>Tips for Effective Investigations</u>, Appendix D-2 *Evidence and Analysis of Issues, Facts and Conclusions.* Instead of considering Ward's bias toward providing evidence slanted toward termination, the Agency arbitrarily took her testimony that chaperones were always readily available as established fact. Rec. at 33-44. It not only overlooked Ward's bias, it overlooked the evidentiary contradiction of Ward's chaperone availability claim. Thus, Ward testified that chaperones could have been obtained from the emergency room, (hereinafter "ER") or primary care, (hereinafter "PC"). Rec. at 498, p. 9. Rather than obtain confirmation or denial by calling nurses from the ER or PC as required by 0700, the AIB only questioned one PA from PC about availability of his nurse. He contradicted Ward's testimony by testifying that his nurse is too busy to help Martin. Rec. at 492, p. 9. The AIB failed to discuss the inconsistent testimony to conclude that chaperones were available; and as such, its arbitrary finding of availability was not only made by ignoring 0700 instruction, it was not based on substantial evidence. **By ignoring 0700, the AIB not only violated its own regulation, it breached the duty set forth in the AIB charge letter from McGraw.** *See* Rec. at 46-47. Therefore, the finding of chaperone availability should be set aside.

Furthermore, the AIB failed to consider the agency's fault in Martin's lack of chaperone use. Substantial evidence exists to establish the agency's fault for a lack of a chaperone for pre-employment physicals. Rec. at 221-27; 441; 497; 712; 714; 752; 774; 775, pp. 623-24. The record reflects that Ward made special arrangements for other PAs doing opposite sex physicals. Rec. at 444, p. 19; 773, p. 617. Ward could have just as easily provided that arrangement for Martin, but did not, despite her actual knowledge that Martin had formally sought to hire an LPN twice and had asked for chaperone help after being instructed to use them. Rec. at 497, p. 8; 498, p. 9. The record establishes that Martin also attempted to obtain chaperones from the volunteer pool, but was likewise denied by the Agency. Rec. at 752, p. 533; 753, p. 534. Moreover, it is undisputed that Rusty scheduled pre-employment physicals around the lunch hour to allow perspective employees the ability to use the lunch hour at their current employment. Rec. at

444, p. 19. Martin's supervisors, Ward and McBride could have easily scheduled chaperone availability during the approximate two-hour period of time on the days pre-employment physicals were being given, but did not. Rec. at 774, pp. 618-19. However, McBride was not permitted to testify at either the AIB or the DAB, and Ward, despite acknowledging Rusty's requests for assistance, inexplicably thereafter testified that he should have asked for help.[45] In spite of the substantial record evidence of Martin's attempts to obtain a chaperone and the ease with which the Agency could have provided one, Agency fault was never considered at any point. Apparently, the Agency is blind to its own culpability.

Additionally, neither the timing, the pre-existing rumors, Rappold's demeaning testimony nor her obvious bias were explored by the Agency investigation or considered by the Agency's findings and conclusions. Rec. at 33-44. These requisite considerations were ignored even though Rappold's dislike of Martin was obvious. Rec. at 635, p. 177 (Osman admitted Rappold's bias was evident). It likewise failed to consider Rappold's undue influence on Blankenship. Moreover, the record reveals that at least one AIB member neither understood his duties on the AIB nor understood how the testimony and evidence is used to establish conclusions. Thus, Osman admitted that he does not know the 0700 guidelines or even what the 0700 is. Osman testified that he did not know the medical records had been withheld from Martin,[46] and that Martin's inability to answer questions about these examinations beyond generalities, even assuming Martin had been given the medical records, was not unreasonable. Rec. at 640, pp. 198-99. When the controlling authority was pointed out to Osman from the occupational Health Guide Book[47] and he read that

---

[45] *Compare* Rec. at 497, p. 8 and 498, p. 9 *with* Rec. at 774, p. 618.

[46] Rec. at 638, p. 192; 639, p. 193-95. Osman made this admission even though he was on the AIB panel when the witnesses were told that their medical records would not be revealed to Martin. His confusion about his role on the AIB is substantiated throughout his testimony. *See* Rec. at 637, pp. 185-87; 623, p. 130; 624, p. 133, 136; 625, p. 139; 626, p. 141; 628, p. 149, 152; 629, p. 154; 630, p. 160; 631, p. 161; 632, p. 168; 633, p. 172; 634, p. 173, 175-76; 636, pp. 181-84; 638, p. 192; 639, p. 193; 642, p. 205-07.

[47] Rec. at 311-325

"there is no uniform, general recommendations for the scope and content of the history, physical exam or laboratory tests,"[48] Osman admitted that there is controversy in the OC field on this issue and eventually admitted that as stickler for details, it is possible that Martin would not testify to a standard OC exam when one does not exist.[49] Yet, Osman refused to acknowledge the impropriety of the "standard exam" question even though he admitted that there is no standard OC exam in his own practice.[50] Given his testimony contradicts his AIB findings, it's clear he misunderstood his role on the AIB.  His ignorance of his responsibility can be further identified where he claims he was unaware of the fact that Martin was the union VP[51] and had spearheaded a whistle-blower investigation by the OSC into the pharmacy practices established by Rappold.[52]  Osman admitted that this information would have affected his credibility determination of Rappold, the individual who urged Blankenship to start these proceedings against Martin. *Id.* at 175-76. Despite Osman's admitted importance of this information and the AIB Chair's knowledge of it, in violation of 0700, it was not investigated or considered.

**B.   Agency Findings and Conclusions are Unsupported by Substantial Evidence.**

To reach their conclusions, the Agency ignored the substantial evidence. Thus, Rappold's improper influence and control over Blankenship was ignored by the AIB in determining credibility. Rec. at 33-44. Without questioning either Rappold or Blankenship about possible improper motivation, the AIB, in direct contradiction to Blankenship and Rappold's testimony, determined that Blankenship "had no reason to lie"

---

[48] Rec. at 313; 631, p. 164.

[49] Rec. at 632, p. 165-68.  In fact, Osman likewise admitted that fact during his AIB questioning of the witnesses.  Rec. at 446, p. 26.

[50] Rec. at 619, p. 114. ("medical history and the job functions usually just sort of dictate how inclusive the exam should be."). Rusty Martin continually stated this exact same concept throughout the two years of proceedings. Martin's testimony, although consistent with Osman's, was found by the AIB to be evasive and therefore highly adverse to Martin's credibility without any explanation beyond evasive.

[51] Rec. at 634, p. 173

[52] *Id*. at p. 174-75.

and was therefore found credible.  Rec. at 653, p. 251. The evidence however establishes the opposite. Blankenship was new to the area, admittedly in need of friends and workplace acceptance,[53] and became engaged in a discussion about Rusty when coworkers were sharing "funny" stories at the end of a shift. Rec. at 395, p. 15. Rappold claims Blankenship openly told the pharmacy staff in graphic detail what she believes happened to her during her pre-employment physical. *Id*. at 4-7 ("the rest of my staff were completely appalled at what she was saying had happened."). Blankenship likewise admitted she discussed it with fellow employees. Rec. at 505; 507; 395, pp. 14-16. Despite Blankenship's ability to freely describe the incident to new coworkers in the pharmacy whom she barely knew, Rappold claimed to being present for 'support' each time Blankenship gave details to officials about the incident. *Id*. at 8. Likewise, the AIB failed to address Moorman's contradiction of Rappold's testimony or explain its reliance on Rappold rather than Moorman. *See generally*, Rec. at 32-44.  Instead, the Agency described Martin as sleazy despite finding no intentional inappropriate touching by Martin.[54]

Similarly, in finding that Martin required Hayhurst to take her shirt off and he stood and watched her, the Agency disregarded all other witnesses, including Martin who testified that clothes do not come off. Rec. at 443, p. 15; 744, p. 499. Nor did it consider Hayhurst's earlier testimony to police personnel that Martin had done nothing improper and that she did not feel uncomfortable.  *Compare* Rec. at 522 *with* 427, p. 17.  Likewise, the Agency disregarded Athey's description of a FAP exam being conducted on her abdomen, disregarded Martin's and Campbell-Cline's identification of the groin area as the proper location, ignored the absolute impossibility of her description, failed to consult either the treatises, failed to consult the onsite specialist and found Martin had conducted the exam on Athey without explanation. Rec. at 33-44.

---

[53] "I don't [know] many people. The only people I know are truly the people I work with day in and day out."  Record at 396, p. 17.
[54] Rec. at 39.  Despite the role that Rappold played in events surrounding Martin's discipline and the AIB's reliance on her in its findings, Martin was not given the opportunity to call Rappold as a witness at the hearing.  Rec. at 1009-14.

The AIB gave no consideration to Martin's complete ignorance of the facts and allegations for his inability to answer questions; but instead, discredited all of Martin's testimony finding it to be "evasive and contradictory because he was unable to answer some questions." Rec. at 40. While two non-OC providers described a blanket physical, which is contrary to the OC regulation and Osman's own practice, the AIB concluded that Martin's inability to describe a nondescript exam destroyed his credibility. *See* Rec. at 484, p. 6; 491, p. 5-6. This credibility finding was made without mention or consideration of the Agency imposed instruction to keep Martin ignorant of the facts. Rec. at 21, 33-40, 346-47, 1122. In fact, McGraw testified with pride at keeping the accused ignorant of the charges against him. Rec. at 798, p. 14-17. The Agency fails to mention or consider evidence helpful to Martin, giving the appearance there was none. Rec. at 740, p. 483-85. Instead, the AIB used factually unsupported and inconsistent findings as support for conclusions, and upon that Ward recommended discharge. Rec. at 23-28.

Like the AIB, the DAB discredited Martin's testimony without substantial supporting evidence. It improperly discredited Martin's testimony for defending himself rather than exhibiting remorse and conceding fault. Thus, the DAB reasoned:

> [t]hrough the course of the OIG & AIB Investigations and the Disciplinary Appeals Board proceedings, the testimony of the Appellant was concerning to the Board…. The appellant's defense was steadfast that all of the individuals associated with this investigation were all less than honest and that the AIB Members (who had no prior interactions with the Appellant) misrepresented the issues.

Rec. at 859.[55]  Martin's only chance at obtaining a meaningful opportunity to be heard was to point out

0700 errors below by identifying which witnesses maintained bias, motive and a lack of veracity because

---

[55] Not only is this an improper basis for a credibility determination, it is a capricious distortion of the facts. Martin did not assert that "all of the individuals … were less than honest." Instead, in his defense, he questioned the accuracy of 3 witnesses because their exam descriptions were inconsistent with his practice. *Compare* 386, p. 8 *with* 447, p. 31-32; *Compare* 394, p. 11 *with* 446, p. 28; *Compare* 386, p. 8 *with* 447, p. 32. The exam records ultimately produced proved Martin correct, establishing that FAP exams had not been done. Martin questioned the veracity of Rappold and McGraw because their personal animosity toward him for his union work was

DAB rulings eliminated all the other ways.  Holding Martin's defense against him is nothing short of

outrageous.  Nevertheless, the DAB successfully eliminated Martin's ability to defend himself once he had

possession of the material evidence needed from the outset of this action.

As a result of the Agency's improper and unsupported credibility finding, the Agency arbitrarily

and capriciously disregarded all of Martin's testimony in spite of substantial evidentiary support.[56] Such

blanket disregard of Martin's testimony is error because agency credibility determinations must be

supported by substantial evidence.  *Neuway v. Colvin*, No. 15-1112-JWL, 5 (D. Kan. Apr. 15, 2016).

"[F]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a

conclusion in the guise of findings." *Id. See e.g., Wilson v. Astrue*, 602 F.3d 1136, 1139 (10th Cir. 2010),

*Huston v. Bowen*, 838 F.2d 1125, 1133 (10th Cir. 1988), *Hackett v. Barnhart*, 395 F.3d 1168, 1172 (10th Cir.

2005). In fact,

> [b]ecause a credibility assessment requires consideration of all the factors 'in combination,'
> when several of the factors relied upon by the [agency] are found to be unsupported or
> contradicted by the record, a court is precluded from weighing the remaining factors to
> determine whether they, in themselves, are sufficient to support the credibility determination.

*Neuway v. Colvin*, No. 15-1112-JWL at 6 (*quoting Bakalarski v. Apfel*, No. 97-1107, WL 748653, 3 (10th

Cir. 1997).  In this instance, the agency erred not only by failing to consider the Martin's inability to provide

direct answers in the context of its own failure to provide the factual evidence to him, but the agency failed

by discrediting Martin's testimony where it was supported by substantial evidence. For example, Martin

---

common knowledge and ultimately obvious from their testimony. Likewise, Ward, as the official
proposing his discharge, was certainly bias toward termination. *Id.* Thus, Martin correctly
questioned the credibility of a few witnesses rather than ALL witnesses. *See* Rec. at 882-959.
Additionally, the DAB's additional unsupported assumption that Martin had no prior interaction
with AIB members is also incorrect. Perkins served on committees with Martin and chaired the
prior investigation against Martin. Rec. at 649, p. 236.

[56] Rec. at 33-44; Rec. at 856-76.

testified that he does not remove clothing or expose genitals of the patients.[57]  Rec. at 443, p. 15.  In support, every witness besides Blankenship who was questioned reported that Martin did not go beneath their underwear, including Athey and Hayhurst. Rec. at 386, p. 8; 412, p. 10; 510-11; 513.  The AIB disregarded this substantial supporting evidence and found that Martin put his hand beneath Blankenship's underwear. Rec. at 23.  Likewise, Blankenship is the only person who testified that Martin unfastened her bra; all remaining witnesses asked responded that Martin did not unfasten bras.[58]  Nevertheless, the AIB found as established fact that Martin unfastened Blankenship's bra because he testified that he had on occasion helped old ladies who were unable to reach and in need of help. Rec. at 443, p. 15. Blankenship is not an old woman. Rec. at 36. The AIB went even further against the substantial evidence in determining that Rusty had unfastened Blankenship's bra without her permission.  Rec. at 23.  Martin testified that had never, and would never, occur.  Rec. at 526; 443, pp. 15-16.  No other witness testified that Rusty unfastened them without permission; yet, despite the clear weight of the evidence, the AIB found that Martin unfastened both Blankenship's bra and pants, and did so without her permission.  Rec. at 23. The DAB followed suit despite the lack of substantial evidence as to these findings and despite Martin's testimony that he did not perform a FAP exam on her so his hand would have been nowhere near her groin.  Rec. at 742, pp. 492-93.  As such, these findings and specifications based thereon should be set aside as unsupported by substantial evidence.

---

[57] Martin testified that if he were conducting a FAP exam and the patient were wearing large underwear, such as boxers, that would cover the side of the leg where the pulse is located, only then would he be required to go underneath the underwear to palpitate the pulse. Rec. at 449, pp. 38-40.  At this point, Martin was still unaware whether he had conducted a FAP exam at all, who was claiming he had done one, whether it was an emergency room exam, requisite practicing on volunteers or pre-employment exam, male or female, what the person was wearing and the job description, if necessary. (It could have been a male with boxers on for all Martin knew at the time).  However, once some of the exam records were produced to Martin, he was able to determine that he did not conduct a FAP exam on Blankenship, and therefore, no matter what the style of her underwear, he did not put his hand underneath it.

[58] Rec. at 511; 513; 519; 521; 532; 535; 387, p. 10; 402, p. 7; 417, p. 7; 424, p. 6; 432, p. 7; 458, p. 7; 464, p. 12.

Athey based Agency findings supporting Martin's discharge are similarly unsupported. The evidence herein clearly shows that a FAP exam is conducted in the groin area where the pulse is located. Athey consistently testified that the exam to which she was referring was conducted on her abdomen at the waistline of her pants. Rec. at 386, p. 8; 609, p. 74. Therefore, her own testimony establishes she was not given a FAP exam. Additionally, she admits she was never told she was given one. *Id*. Martin was able to confirm to the DAB that Athey was not given a FAP once given records. Rec. at 742, p.493. Therefore, not only is the DAB finding and conclusion that Martin performed a FAP exam on Athey arbitrary and capricious and without substantial support, because as medical professionals who know where a FAP exam is performed,[59] the DAB abused its discretion by upholding specification based on a physical impossibility.

Hayhurst based Agency findings are likewise unsupported by substantial evidence.  As established, Martin's OC practice did not require undress or exposure. All the witnesses confirmed this fact including Hayhurst in her original testimony to the OIG. *Compare* rec. at 521-22 *with* 444, p. 17 *and* 612, p. 87. She changed her story at the AIB and DAB to become the only person who claimed that Rusty not only made her remove her shirt, he watched her do it. *Id*.  Even Blankenship testimony establishes that her jeans, bra and shirt remained on.[60]  Therefore, the DAB's finding and conclusion that Martin watched Hayhurst after requiring her to remove her shirt is not supported by substantial evidence, but based solely upon her inconsistent testimony.  Therefore, the specifications based upon Hayhurst's testimony are contrary to the substantial evidence and should be set aside. *Id*.

The Agency finding that Martin engaged in IPP by failing to use chaperones is not supported by substantial evidence.  It does not "articulate a rational connection between the facts found and the decision

---

[59] Once again, the DAB members, as medical providers KNOW that Athey could not have been describing a FAP exam, yet, not one of them had the decency to stand up and say we are wrongly accusing an innocent based upon testimony that establishes nothing more than an impossibility.
[60] Blankenship's claim that he unfastened her clothes depends upon her clothes being on.

made." *Kreso*, 67 F. Supp. at 1239. In fact, as to the chaperone issue, the DAB "offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Taylor*, 90 F. App'x at 276-77; *Lerner*, No. 3:12-CV-565 at 11.[61] Lacking a legal basis upon which to base its conclusion, the Agency committed additional error by basing its chaperone decision on a statement made by AIB member, Osman to establish "standard of care." The DAB's reliance is misplaced because it is not supported Osman's actual testimony. Rec. at 856-76. In this instance, Osman is member of the profession of physician assistants, similarly situated in the VA OC department and he testified that he does not use chaperones unless requested. Rec. at 627, p. 146. ("I don't have nurses available either, but if somebody wants a chaperone, I step out of the exam room and I go find somebody.").[62] Osman further admitted that most refuse. Rec. at 618, p. 111. Thus, most of Osman's exams are conducted without a chaperone present. Inasmuch as the DAB's characterization of Osman's opinion as to standard of care runs contrary to Osman's testimony about his actual practice, the DAB erred in reliance upon it. *Doe,* 848 F. Supp. at 1232. Consequently, the DAB's conclusions with regard to specifications based upon chaperone use should be set aside because such conclusions are not supported by the substantial evidence, but are rather, contrary thereto.

---

[61]Moreover, the DAB's own decision reflects that it does not truly believe that use of chaperones in a pre-employment physical is the standard of care employed at any VA, including the Beckley VAMC. Thus, charge two, specification nine was not sustained by the DAB although it involved the same facts: Martin conducted a pre-employment physical on a female, Rhonda Milam, without a chaperone present. Rec. at 869. This specification was not upheld because Milam testified that she was not uncomfortable and that the exam was proper. *Id*. *See also*, Rec. at 729, p. 440; 730, p. 445; 731, p. 446.. The DAB's inconsistent conclusions establish that inappropriate professional practice findings were based not on a violation of a standard of care, but rather, upon whether the person was uncomfortable in the exam. Rec. at 869-70. is not a proper basis upon which the DAB can base its determination. *See Lerner*, No. 3:12-CV-565 at 34-35. *See also*, 38 U.S.C. §7462. *See also*, addendum at D-3 *demeanor.*

[62] This is Martin's testimony also. He consistently testified that he offers chaperones, and if the patient wants one, he will get a nurse. Rec. at 444, p. 18.

In addition to the foregoing findings and conclusions unsupported by substantial evidence, Charge 4, specification 2, inaccurate documentation, was upheld by the Agency without substantial evidence therefore.  Rec. at 873.  The DAB found that Martin failed to accurately document the time of an EKG because the EKG printout did not match the date Martin signed off on the exam. *Id.* In support of this conclusion, the DAB states that Martin's explanation for mismatched dates cannot be believed because if the EKG clock were wrong, it "would indicate a much more grievous issue of equipment maintenance and performance that would have much broader implications for the facility." *Id.*[63] There is no fact on the record to support this conclusion; rather, the opposite is true. The evidence establishes that Martin did not perform an EKG on this patient. Rec. at 411, p.5. To that end, the patient testified that Martin did not conduct an EKG on him. *Id.* Interestingly, neither the patient's name nor Martin's name appears on the EKG provided by the Agency. Consequently, the evidence fails to establish that (1) Martin conducted the EKG or (2) that the printout provided belongs to that patient. Given this evidence, the DAB finding that Martin inaccurately documented an EKG is simply unsupported by substantial evidence. Accordingly, the DAB's conclusion that Martin inaccurately documented an EKG is contrary to the evidence, and should be overturned.

### C. <u>Agency Findings and Conclusions are Unsupported by Law or Regulation</u>

Examination of the record reveals that charge 2, specification 5, (IPP skimping), even if not misconstrued by the Agency, is not a violation of the regulation relied upon by the DAB as support. Nor is <u>INCLUDING</u> an exam component deemed necessary by the provider.  Thus, the DAB properly recognizes that the CEOSH is the controlling Agency authority for performing pre-employment placement exams. Rec. at 311-314 (CEOSH guidelines).  Rec. at 856-876, p. 9 (DAB Report). A review of this regulation reveals

---

[63] Martin's commitment to honest is also evident from this testimony. Because he does not know why these dates do not match, he attempted to find out. When it became clear a concrete answer could not be obtained, Martin testified that one of those possibilities is a mistake by him. As is typical of the Agency throughout, Martin' obvious honesty was ignored.

that the provider is required to tailor his exam to the job duty description of the applicant/patient. Rec. at 311-314. It instructs that exams performed on one may not be required for another. *Id.* It requires provider discretion to determine which exam components are necessary. The provider does not violate its provisions by conducting certain exam components on some and not on others, as the Agency insists, unless the provider conducts an exam listed as inappropriate for pre-placement exams. *Id* [64] Martin was not charged with performing one of the exams from the list or failing to do an exam he should have done for any particular applicant's job description. *Id.* As such, the DAB's conclusion that skipping some elements of an exam is a violation of CEOSH is clearly wrong and unsupported by that authority.

Moreover, this DAB finding should be considered arbitrary and capricious since Osman, the PA on the AIB agreed at the DAB that Martin's testimony had been misconstrued by the AIB. Rec. at 629-632. Osman confirmed that pre-employment exams are tailored to the individual and the job description, and that Martin's refusal to testify to a "standard exam" was not necessarily evasive, but because there is no standard CEOSH exam. *Id.* Osman conceded that Martin's reference to skimping exam components referred not to whimsical exam selection choice by Martin, but instead to the description of the detailed steps possible in a "Bates" exam as compared to a CEOSH exam, just as Martin had explained. *Id.* Osman even explained that there is a wide variance in pre-employment exam techniques. Rec. at 632, p. 165. Furthermore, in rendering its decision on this skimping specification, the DAB did not consider that Martin's AIB testimony was given in ignorance of the facts and charges forcing him to guess at every possible reason he might not perform a particular task in a pre-employment exam. Therefore, not only is specification 5 unsupported by the authority relied upon, the factual support identified arbitrarily ignores Osman's confirmation of the intent

---

[64] It does not disallow management of patient clothing to perform an exam. Thus, it is common sense that a provider MUST touch a patient to perform an exam. It is likewise typical that patients are not comfortable when subjected to an exam. Nevertheless, touching and patient comfort are not proper basis' for finding UCC and IPP.

of Martin's AIB testimony and the AIB's misunderstanding of it.  The DAB's attempt to establish a

standard of care is an improper attempt to implement state common law as a basis for its conclusions.

Because Congress and the Agency have not created a statute, regulation, procedure or policy for using

chaperones for pre-employment physicals at a VAMC, state common law is the only arguable source from

which the DAB's claimed standard of care can arise. Thus, the West Virginia Supreme Court of Appeals

has instructed that a professional "who undertakes to perform professional services for a client is required to

exercise the knowledge, skill and ability ordinarily possessed and exercised by members of the [] profession

in similar circumstances."  *Doe v. American Red Cross*, 848 F Supp. 1228, 1232 (S.D.W. Va. 1994).[65] As

heretofore established, Osman's testimony does not support this common law theory because he testified

that he usually does not use chaperones. *See* discussion *supra* at III C.  Since the DAB relied totally upon

the testimony of Osman to create a standard of care it then retroactively applied to Martin to sustain nine

specifications under two charges, and such reliance is not supported by Osman's actual testimony, the

DAB's decision as to those specifications as approved by the Undersecretary of Health is nothing more than

an arbitrary and capricious attempt to uphold unsustainable charges and specifications, especially where the

agency found that the conduct was not intentional.[66]

Martin's discharge is not based upon any existing authority and should therefore be overturned.

The law and the CBA require that the employee sought to be discharged must be provided with specific,

detailed information defining what the employee is being charged with violating. 38 U.S.C. §7462. Martin

was not provided with detailed authority for charges because it does not exist. Additionally, the Agency did

---

[65] (*citing Bluefield Mun. Bldg. Comm'n*, 167 W. Va. 318, 280 S.E.2d 101 (1981); *Murphy v. N. Amer. River Runners, Inc*., 186 W. Va. 310, 412 S.E.2d 504 (1991); *Weaver v. Union Carbide Corp*., 180 W. Va. 556, 378 S.E.2d 105 (1989).
[66]*Lerner*, No. 3:12-CV-565 at 35-37 (court noted that where the "VA did not believe that any of [the] alleged inappropriate conduct had been either deliberate or intentional," DAB findings of inappropriate conduct lend support to the arbitrary and capricious nature of the findings).

not identify how the discipline was derived, although required to do so by the law and the CBA, because it was not based on any authority. Thus, the record contains a Table of Penalties which sets forth the conduct for which an employee can be disciplined, what discipline applies to that conduct and when termination as discipline is appropriate. Rec. at 562-72. A review of this table reveals that neither the UC and IPP charges are listed therein nor are the specifications. *Compare* Rec. at 565-72 *with* Rec. at 855-76. In fact, nothing within the table comes close to the charges sustained against Martin. *Id.* Indeed, when asked by Chairman Penn whether she consulted the table in determining discipline, McGraw could only state that she had; however, she did not, because she could not, state that the charges correlate to punishable offenses set forth therein. Rec. at 804.

Likewise, as heretofore discussed, while 9 out of 11 of the specifications are based upon or supported by a lack of chaperone use, there is no law, regulation, policy or procedure which requires the use of chaperones at the VAMC. The DAB even admitted it knew that "[t]here was no evidence presented of the Medical Center having a specific policy regarding the use of chaperones…," but capriciously failed to acknowledge that the DAB members KNEW that no such policy exists. Rec. at 867-68. Given the nonexistence of authority requiring the use of chaperones, Martin was not provided with it and cannot be guilty of its' violation. As such, each of the 9 specifications should be set aside as unsupported by law.

Moreover, Martin was not provided with law, regulation or policy requiring that he perform a standard exam in pre-employment physicals because the applicable authority clearly instructs there is no standard exam. Each exam must be tailored to the job and individual applying for it. Rec. at 313. Because the AIB and DAB discredited Martin's testimony for refusing to describe a "standard exam" where one does not exist, the Agency's credibility determination is not only arbitrary and capricious, it was made in direct contradiction to the governing authority, CEOSH. It too should be set aside as unsupported by law.

## CONCLUSION

For all the reasons set forth herein, Rusty Martin prays that his discharge be set aside as unsupported by substantial evidence, law and procedure, being the result of arbitrary and capricious findings and conclusions, but mostly due to the Agency's abuse of discretion and flagrant disregard of his right to due process protection in this action. Because he is not guilty of the charges levied against him and because the evidence, without considerable manipulation and sophistry, does not support a reason for his discharge, Rusty Martin seeks to have it overturned, restoring his honor, integrity, reputation and employment. Finally, since the Agency cannot support Martin's discharge with any existing law, regulation or policy violation, Martin seeks his record be expunged and be restored to his former position seamlessly.

Respectfully submitted, this 7th day of December, 2016.


__s/Jenny A. Bonham_____
Jenny A. Bonham, SBN 5567
Counsel for Russell Martin, Petitioner



Bonham Legal Services
315 N. Mullens Road
Hinton, West Virginia 25951

(681) 238-5254 office
(304) 690-5427 cell

jbonhamlaw@aol.com